Filed 1/25/24  P. v. Evans CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES EDWIN EVANS,<br><br>Defendant and Appellant. | F085206<br><br>(Super. Ct. No. CF92469952)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Petitioner James Edwin Evans appeals from the denial of a petition for resentencing pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] and a judgment following resentencing pursuant to section 1172.75.

He contends (1) the court erred in denying his section 1172.6 petition at the prima facie stage because the record does not conclusively establish he was convicted under a valid theory of attempted murder; (2) the concurrent and consecutive terms imposed by the court are unauthorized and all but one of the terms must be stayed; (3) remand is required for the court to determine which of the terms to stay; (4) on remand, the court should be directed to conduct a full resentencing, to include application of amendments to sections 1170 and 1385; and (5) on remand, the court should calculate and grant credit for all days petitioner has served in custody through the date of resentencing.

We conclude the record does not establish petitioner's ineligibility for resentencing pursuant to section 1172.6 as a matter of law. Accordingly, we reverse the order denying the petition and remand with directions to issue an order to show cause.

With regard to petitioner's resentencing pursuant to section 1172.75, we accept the People's concession that the court erroneously imposed concurrent terms on counts two and four. We conclude this error requires us to vacate the sentence on these counts and to remand for the court to determine which terms must be stayed. We also accept the People's concession that, on remand, the court should recalculate petitioner's custody credits. However, in light of our vacatur of the sentence on counts two and four and the remand for further resentencing proceedings, we decline to reach petitioner's remaining

---

[1] Undesignated statutory references are to the Penal Code. Former section 1170.95 has been renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) Except where otherwise noted, we refer to the current section 1172.6 in this opinion.

2.

contentions, which were not previously raised in the trial court and which may be raised on remand.

## FACTUAL BACKGROUND

We previously summarized the facts underlying petitioner's offenses as follows.[2]

"In 1992, William [M.] and his father, Burl [M.], resided [on] North Chateau Fresno Avenue in Fresno County. At one time, Burl [M.] had been married to the mother of defendant Eric McGowan. William [M.] met McGowan around Christmas 1991. They got to know one another when McGowan would go to the [M.] house and visit. William [M.] and defendant McGowan treated each other like brothers.

"On the evening of July 7, 1992, William [M.] was at home alone. He went to bed at 9:30 p.m. but was awakened by some banging on his bedroom window at about 12:45 a.m. [William] went to the window and saw defendant McGowan. McGowan jumped up and down and asked for entry. [William] told McGowan to go around to the back. [William] then left his bedroom, took a .22-caliber semi-automatic rifle from the hall closet, and met defendant [McGowan] outside a sliding door.

"McGowan had a bandage on his arm and said he needed help because either his ex-girlfriend or girlfriend had cut him. [William] asked whether he needed to use the telephone and then walked into the house with McGowan behind him. [William] put the rifle back in the hallway closet and proceeded to his room to get the telephone. When he took the telephone from his bedroom, he saw defendant McGowan with a .22-caliber rifle. McGowan stated, 'I'm gonna shoot ya.' [William] said something and McGowan responded, 'No, no, I was jokin'.'

---

[2] We provide these facts for background purposes in relation to petitioner's resentencing arguments arising under section 654 but do not rely on these facts in resolving issues relating to petitioner's petition for resentencing pursuant to section 1172.6. (See § 1172.6, subd. (d)(3).)

Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

3.

"McGowan then ran toward [William]. [William] ran into his room and held the bedroom door closed with his body. McGowan tried to force open the door several times unsuccessfully. After a while, [William] opened the bedroom door to take a look. He saw McGowan and three masked . . . men in the hallway. The . . . men were wearing bandannas over their faces and McGowan was still holding the rifle. [William] ran back into his bedroom but the men in the hallway followed and jumped him as he tried to get outside through a bathroom door.

"At this point, McGowan came up and put the rifle to [William]'s head, and said, 'Freeze. Stop.' [William] complied. The other . . . men pushed and tried to knock him down. They sprayed a substance in his eyes that smelled like Raid, Black Flag, or some other sort of insecticide. The men also told him to shut up. [William] continued to struggle and tried to keep moving toward the gate. However, the assailants were finally able to get him down to the ground. At this point, defendant McGowan was approximately five yards away. McGowan pointed the rifle at [William], called [him] . . . '[n]o good . . . ,' and told the three males to kill him. [William] was on the ground at this time and felt something sharp go into his side. Someone also tried to cover his face with a handkerchief. [William] was scared and repeatedly tried to get away because he wanted to live. The men kicked and hit him numerous times and [William] felt another stab in his shoulder.

"[William] pleaded with the men to stop their attack. He heard one of the assailants say, 'I lost my glasses. I can't find my glasses.' [William] then said, 'I'll get you guys the money,' and they stopped hitting him. [William] managed to stand up and they all started to push him. Defendant McGowan, who was in front of [William], pointed the rifle at him and tried to push him back into the house. The other assailants were behind [William] holding his hands. They all started walking toward the house. [William] then felt a stab to his kidney. He fell to his knees and said, 'Let go of me.' Defendant McGowan ran to the house. Once the assailants let go of [William], he

4.

somehow ran to his neighbors' house. As [William] was running, he could hear the assailants pursuing him. He said their pursuit sounded like a herd of deer running behind him.

"Although [William] was losing oxygen, he ran through the north gate of his home and down the gravel driveway. He was barefooted and injured his feet as he ran. He eventually made his way to the home of neighbors and they called medical emergency. An ambulance came and rushed [William] to the hospital. He had been stabbed in four places, his lung had been punctured, his kidney had been cut, and he lost a substantial amount of skin from his feet. [William] was hospitalized until the afternoon of July 10 and was off from work for two months. He had to relearn how to walk because he lost all the skin on his feet. [William] still had physical problems at the time of trial. He could not lay on his bed straight anymore and still experienced pain. [William] said he could not lift as much as he used to before the incident and suffered a permanent limp from the injury to his feet.

"When [William] returned to his father's home, he determined a number of items were missing, including a Marlin .22-caliber semi-automatic rifle, a VCR and dust cover, an answering machine, a watch, an ice chest, a pair of handcuffs, and a quantity of food. A .22-caliber live round was found on the floor of the dining room and a gold chain with charms was found near the swimming pool.

"[William] could not identify any of his assailants other than McGowan. He described the other assailants as bigger, wider, and stockier than McGowan.[3] Fresno County [S]heriff's detectives talked to [William] in the hospital and learned of McGowan's involvement. They also learned McGowan was staying at [a m]otel in Fresno. Officers arrived at the motel and set up surveillance at noon on July 8th. At

---

[3] "The prosecutor had the three defendants stand and noted for the record that [petitioner] and [codefendant Andress A.] Yancey were taller and stockier than defendant McGowan.

5.

about 1 p.m., officers saw [codefendant Andress A.] Yancey drive into the motel parking lot and go into room 35. Officers went to the room and ordered the occupants to come out one at a time. Three . . . men (defendants McGowan, Yancey, and [petitioner]) and two . . . women (Angela [M.] and Sherry [Y.]) emerged from the room.

"Officers searched the motel room and found Burl [M.]'s watch, handcuffs, and rifle, a .22-caliber semi-automatic handgun, a knife and two pairs of shoes. Officers located the rifle and handgun under the bed. They searched Yancey's car and found a dust cover for [William]'s VCR. The police were also able to lift the fingerprints of [petitioner], Yancey, and one Jeffrey Todd [B.] from the car.

"Defendants McGowan and [petitioner] were barefoot when they left room 35 and codefendant Yancey was wearing shoes. [J.] Tarver, a criminologist with the Fresno County Sheriff's Department, compared the soles of Yancey's shoes and the other shoes found in the room to photographs of shoe prints found in the dirt around [William]'s house. Tarver concluded some of the prints were consistent with Yancey's shoes. The shoes in the room also had some characteristics in common with the photographed prints.

"Yancey waived his constitutional rights at the Fresno County Sheriff's Department and Detective [J.] Flores interviewed him. At first, Yancey claimed he spent the night with his girlfriend, Penny [G.]. Later, he admitted he was the fourth person in a car that drove into the country. He claimed he remained in the car while the others got out. The others then came back with a VCR, a camera, an ice chest, beer, and a rifle. Yancey said the quartet drove to the . . . [m]otel. Yancey sat in a motel room talking to [Angela M. and Sherry Y.] while the other men took the car to get more beer. After the sun came up, Yancey took the car and went to his girlfriend's house. He brought the car back to the . . . [m]otel and intended to eat with the others when Fresno County [S]heriff's deputies arrived at the scene. Yancey denied any involvement with the crimes. He said he was from Los Angeles, he knew no one, and the others were 'putting it on' him.

6.

"Angela [M.] testified she got the room at the . . . [m]otel on July 7 and asked McGowan and Sherry [Y.] to come along because she did not want to be alone. The trio watched television until 11 p.m. or so when the others drove up and gathered in the parking lot. [Petitioner] and a man named Lewis arrived in a white car with two men she did not know, Yancey and Todd.[4] Todd was driving the white car. He was . . . the only man in the group wearing glasses. [Angela M.] said three women—Precious, Jackie, and another woman—were in a second car.

"[Angela M.], [Sherry Y.], and McGowan joined the group in the parking lot. They passed around a 40-ounce bottle of beer and McGowan drank from it. During this time, [Angela M.] heard [petitioner] and McGowan talking. [Petitioner] said they had to go get some money but McGowan said ' "Na. Na." ' A few minutes later, all five men left in Todd's car. Precious, Jackie, and the other woman left in the other car.

"[Angela M.] said she and [Sherry Y.] then went up to their motel room. They were awakened about 2 a.m. by knocking. McGowan, Yancey, and [petitioner] were at the door. McGowan was shaking and 'acting weird.' Yancey ran to the bathroom. A couple of minutes later, Yancey came out and sat in a chair. [Angela M.] noticed he had a .22-caliber handgun and a knife. Yancey placed the knife on the nightstand by her bed and began kissing and grabbing at her. He also waved the handgun at her. [Angela M.] picked up the knife and waved it back at him.

"McGowan had a rifle and was sticking something in the barrel. McGowan said he had taken the rifle from a house but the rifle was jammed. Yancey also said he had gone to a house and stuck a boy with a knife. Yancey added the knife would not go in so he just started sticking. [Petitioner] had nothing in his hands.

---

**4** "[Sherry Y.] referred to Yancey's companion as 'Todd.' [Angela M.] referred to him as 'Tide.' She also referred to Yancey as 'Blue' and to [petitioner] as 'Poncho.' "

7.

"[Petitioner] and [Sherry Y.] left the room at about 3 or 4 a.m. and returned sometime later.  At about 7 a.m., [Angela M.], McGowan, and [Sherry Y.] took the car to get a refund of a deposit she had made on a different motel room.  When the trio returned, Yancey took the car and left the motel.  He returned just before the sheriff's deputies arrived.  Todd had called and talked to [petitioner] at some point in the morning.

"[Angela M.] testified Todd is tall and skinny, Lewis is tall and chubby, and she is five foot, four inches tall and weighed [199] pounds in July 1992.  [Angela M.] admitted lying when officers first interviewed her on July 8.  She initially told officers she had not seen a rifle and did not know who had the pistol.  She did not remember saying [petitioner] had the knife.

"Sherry [Y.] testified she had been with Angela [M.] when she was awakened by some knocking.  She saw McGowan with a rifle and Yancey with a knife, a handgun, and blood on his hands.  Yancey said he tried to stab someone and McGowan said the rifle did not work.  At 5 a.m., she and [petitioner] went to a store to buy some alcohol.  At some point during the evening, they were alone together for two or three hours and engaged in sexual intercourse.  [Sherry Y.] testified she was not certain whether [Angela M.] was with her or whether [petitioner] was with her when she heard the knocking at the door.  [Sherry Y.] then recalled [Angela M.] had been with her.  She also recalled [petitioner], McGowan, and Yancey were the individuals who entered the room after the knocking.

"[Sherry Y.] also testified about a conversation she had with [Angela M.].  [Angela M.] said she had gone to the house, had struck the boy, and had helped remove property from the house.  [Sherry Y.] then testified [Angela M.] had only been bragging and the latter had not actually been involved.

"[Sherry Y.] admitted she lied during an interview with Fresno County [S]heriff's deputies.  She also admitted she was serving time for felony child endangerment at the time of defendants' trial.  [Sherry Y.] claimed she had not been drinking on the night of

8.

the incident and did not recall telling a detective she had been drinking all night long. [Sherry Y.] testified she was [petitioner]'s girlfriend before July 7. She later learned he had called her a 'bitch' in a letter and that he had also been dating one Rashonda [S.].

"Rashonda [S.] testified she had been [petitioner]'s girlfriend for two and a half months at the time of the crimes. During that time, she gave [petitioner] a gold chain necklace with a cross. Officers found that necklace at the crime scene, near [William]'s swimming pool. In August 1992, [petitioner] wrote [Rashonda S.] a letter which stated: 'Before I go any further into this letter, I must let you know, Rashonda [S.], when you come to see me and my visits was taken, it was my home boy and his wife, they came to help find the bitch Sherry [Y.] and her friend Angela [M.], baby, so I can get out in '93, Rashonda [S.]. If not, I will get 23 years . . . .'

"John G. Moser, M.D., an emergency room intern at Valley Medical Center, testified he treated 20-year-old William [M.] at approximately 2:25 a.m. on July 8, 1992. Moser found four lacerations on [William]'s back—one in the upper right shoulder, one below [William]'s left armpit, and two lacerations on the right side of the middle back. All the wounds were consistent with infliction by a knife. In addition, [William]'s right kidney was lacerated which was a potentially life-threatening injury. Moser also said the skin on both of [William]'s feet was torn off.

"Sheriff's deputies made tape recordings of McGowan, Yancey, and [petitioner] talking to one another while they were incarcerated in adjoining jail cells. The trio discussed their troubles during these recorded conversations, some of which were played to the jury during trial.

"**Defense (defendant McGowan):**

"Defendant Eric McGowan testified on his own behalf. He stated he went to room 35 at the . . . [m]otel at 6 p.m. on July 7, 1992. [Sherry Y.] and [Angela M.] accompanied him. McGowan consumed beer and smoked $20 worth of rock cocaine before arriving at the motel. At approximately 7:30 p.m., he smoked another $20 worth

9.

of rock cocaine in the motel room. McGowan did not smoke or use any other type of drug after that.

"[Petitioner] and Andress Yancey and some girls named Precious, Jackie, and Tammy eventually came to the motel. McGowan joined them in the parking lot and drank some Old English beer. He was under the influence of cocaine and was 'in a different world.' He wanted more cocaine but did not have any money. He told the driver of the white car to take him to his stepbrother's house. He thought his stepbrother, William [M.], would loan him some money. McGowan discussed this matter with [petitioner]. McGowan testified he did not know the driver of the white car or the passengers in that car. However, he knew there were three persons in the car besides himself. These included the driver, the front seat passenger, and the backseat passenger sitting next to him. McGowan stated the white car belonged to Todd and he guessed that Todd was the driver.

"McGowan gave Todd directions to [William]'s home. McGowan testified there were no females in the car. He ultimately testified [petitioner], codefendant Andress Yancey, and Todd were 'probably' the occupants of the car that went to [William]'s home.

"McGowan, [petitioner], Yancey and Todd arrived at [William]'s house. McGowan knew [William]'s father, Burl, was away because Burl was a trucker and his rig was not there. He also knew [William] was in the house by himself. McGowan alighted from Todd's car and knocked on the [M.]'s window. [William] came to the window and told him to go around to the back. He met McGowan with a gun in his hand. McGowan asked whether [William] was going to shoot him and [William] lowered the gun and mumbled something. Then he cocked the gun and McGowan thought he was going to shoot him. [William] said, 'Man, I ain't going to shoot you, man.' [William] then told McGowan to come inside the house. The pair went inside the residence and [William] asked him what he was doing. He also asked what had happened to

10.

McGowan's arm.  McGowan replied he had cut his arm.  [William] then asked how McGowan had gotten to the house.  McGowan replied he had gotten a ride from friends.  [William] asked whether McGowan needed a ride back into town.  McGowan responded in the negative.  [William] put the gun in the closet and went to his bedroom to get the telephone.

"When [William] went into his room, McGowan went to the closet and got the gun.  [William] returned and McGowan pointed the gun at [William].  [William] then ran into his room and peeked out the door.  McGowan said, 'I am just playing with you.'  When McGowan walked toward [William], the latter closed the bedroom door.  McGowan tried to open the door to 'mess with him.'  After a couple of minutes of pushing on the door to open it, McGowan went to the living room.  [Petitioner], Yancey, and Todd entered the residence while McGowan was standing in the living room holding the gun.  They asked what was taking so long and McGowan responded, 'The . . . boy pulled a gun on me.'  [William] then came out of his bedroom and McGowan's friends chased him down the hallway.  McGowan did not say anything.  He stayed in the front room for a couple of minutes and did not see anyone.  When he heard someone yell, he ran down the hallway to the back door.  McGowan then saw [William] surrounded by the others in the backyard.  The trio was beating [William] up.  McGowan did not say anything because [William] had pulled a gun on him earlier.  McGowan also claimed the drugs were still affecting him at that point.

"McGowan testified he did not know anyone had a knife or that they were trying to stab [William].  The three men stopped beating [William] when the latter said, 'I gave him some money.'  McGowan's friends picked the victim up.  McGowan said he asked what they were doing and they told him to shut up.  McGowan denied telling the three men to kill [William].  The three men surrounded [William] and walked toward the house.  McGowan entered the house and waited.  When his friends appeared in the house, McGowan asked where [William] was.  They told him he had gotten away outside.

11.

"McGowan's friends started taking things from the house. McGowan himself took a gun and planned to sell it. He and the others then walked to the car after taking various valuables. Everyone got into the car, drove to a [convenience] store, and bought some beer. During the course of the evening, McGowan testified he drank about a 40-ounce bottle of Old English beer and smoked two $20 quantities of rock cocaine. After leaving the [convenience] store, the group went riding around the west side of Fresno. They returned to the . . . [m]otel after making a few stops. McGowan testified the people in the car went back to the motel but he did not know who they were. He took the gun into the motel room and laid down on a bed. [Sherry Y.] and [Angela M.] were in the room but he denied talking to them. McGowan said the other people in the room were talking but he could not recall what they were talking about. McGowan watched television until he fell asleep. The next morning he was arrested. McGowan testified [Angela M.] and [Sherry Y.] did not go to [William]'s house with him.

"**Defense ([petitioner]):**

"Precious [P.] testified [petitioner] is her uncle. Eric McGowan married [Precious P.] on August 20, 1992, after this incident. On July 7, 1992, [Precious P.] and her friends, Tammy, Jackie, and Amy, followed [petitioner], Yancey, Todd, and Lewis to a liquor store and then to the . . . [m]otel. The men were in Todd's car and the women in Tammy's car. Five small children were with the women.

"The adults socialized in the . . . [m]otel parking lot. Because [Precious P.] and [Angela M.] were 'getting ready to get in a fight,' [Precious P.] decided to take her kids home. Before doing so, she took Todd's car keys so the men would 'stay there' until she returned. However, [Precious P.] left the ignition unlocked and Todd was able to start the vehicle. Todd, Yancey, Lewis, and [petitioner] appeared at [Precious P.'s] house a short

12.

time later.[5]  [Precious P.] gave Todd his car keys and went to the store.  When she returned, [petitioner], Yancey, and Todd were no longer there.  [Precious P.] made two trips back to the motel but she did not find the men.

"The next day, [Precious P.] heard the men had been arrested.  That evening, [Angela M.] and [Sherry Y.] came to her house.  [Angela M.] told [Precious P.], [Sherry Y.], Jackie, and [petitioner's] other niece . . . [that] she had been at [William]'s house the previous evening.  [Angela M.] allegedly said she had seen Yancey stabbing [William] and had helped loot the house and walk [William] to a safe.[6]  [Angela M.] also said [petitioner] had not been there.  Rather, he had been with [Sherry Y.] at the motel during the robbery.[7]  [Precious P.] testified [Angela M.] and [Sherry Y.] threatened to harm her if she testified on [petitioner's] behalf.  [Petitioner's niece] also testified she heard [Angela M.] claiming involvement in the robbery.

"[Petitioner] took the stand on his own behalf.  [Petitioner] testified he met Todd on July 7, 1992, when the latter's car ran into Rashonda [S.]'s car.  After the accident, Todd accompanied [petitioner] to Rashonda[ S.]'s house.  Todd and [petitioner] then went to Precious [P.]'s house.  They left to purchase some beer and, when they returned, they met Yancey.  Sometime later, Todd drove [petitioner], Yancey, and Lewis to the . . . [m]otel.  On the way to the motel, they stopped to buy some beer.  When they arrived at the motel, they drank beer in the parking lot.  [Petitioner], McGowan, Yancey, Todd, and

---

**5** "According to [petitioner's] investigator, [Precious P.] said McGowan was among the men who appeared at her house."

**6** "Fresno County Sheriff's Detective [D.] Gomez testified there was a locked safe box in Burl [M.]'s home office."

**7** "[Angela M.] testified at trial and denied all involvement in the robbery.  She claimed she never said she planned to go to the hospital to pull the plug on [William] and she was 'not going to do any time on this case' or, if she did, she was 'going to take someone with' her."

13.

Lewis then left the motel and went to [Precious P.]'s house. Sometime later they drove to the west side of Fresno.

"[Petitioner] drank beer with [Sherry Y.] and spoke to McGowan in the parking lot of the . . . [m]otel. McGowan owed [petitioner] $20 for crack cocaine which [petitioner] had sold him on credit. The men discussed money but [petitioner] did not 'put heat' on McGowan.

"Sometime later, [petitioner] left the motel with Todd, McGowan, Yancey, and Lewis. They drove to [Precious P.]'s house in Todd's white car and got Todd's car keys. Lewis stayed behind while [petitioner], Yancey, McGowan, and Todd got back into Todd's car.

"Todd drove into the country west of Fresno and went to his brother-in-law's house. [Petitioner] had a problem with Todd's brother-in-law and planned to fight him. [Petitioner] removed his gold chain and left it in the vehicle so it would not be ripped off during the fight. [Petitioner] identified People's exhibit No. 12a (a necklace) as a gift from Rashonda [S.]. [Petitioner] said he had been wearing the necklace on the evening of July 7.

"Once the group arrived at Todd's brother-in-law's house, words were exchanged but there was no fight. Todd stayed there and the others went for more beer and then on to the motel with McGowan at the wheel. Yancey was drunk when they arrived. [Petitioner] and McGowan left him in the backseat and joined [Angela M.] and [Sherry Y.] in room 35. The four talked for a while and Yancey joined them after he sobered up. [Petitioner] and [Sherry Y.] later took the car, went to the store, and drove around for an hour or so. After they returned, McGowan, Yancey, and [Angela M.] took the car. While [petitioner] and [Sherry Y.] were in the room alone, they made love and talked. [Petitioner] eventually fell asleep.

"[Petitioner] woke to the sound of knocking. [Sherry Y.] opened the door and Yancey, McGowan, and [Angela M.] came in. [Petitioner] saw nothing in their hands

and heard no one talk about William [M.]. Yancey later left the motel. The group was arrested after he returned.

"[Petitioner] denied going with McGowan and Yancey to [William]'s house and denied committing a robbery. He further denied having been in the car when the men made the stops on the west side. [Petitioner] testified he did not see [William]'s rifle or the handgun on the evening of July 7 and he denied knowing anything about stolen property until after he was arrested.

"[Petitioner] admitted he had been convicted of armed robbery in 1984, escape from custody in 1985, and assault by means of force like[ly] to cause great bodily injury in 1989.

### "Defense (codefendant Yancey):

"Fresno County Sheriff's Detective [J.] Flores testified as to Angela [M.]'s initial statement on July 8, 1992. [Angela M.] said the men returned to the . . . [m]otel room in the middle of the night. Yancey carried nothing, [petitioner] was carrying a beer, and she did not know if McGowan was carrying anything. She also said she saw [petitioner] with a knife and no one with the rifle and pistol. Detective Flores also interviewed Sherry [Y.] on July 8, 1992. [Sherry Y.] gave two separate stories. In the first, she said she had spent the night at the motel with [Angela M.], [petitioner], and McGowan. She did not see Yancey's hands when he came into the room and she did not see any blood in the bathroom.

"Detective Flores was familiar with Jeffrey Todd [B.], a . . . male who was bigger than defendant McGowan. The car found at the motel parking lot on July 8 was registered to [Jeffrey Todd B.]. He reported the car stolen over an hour after the incident at William [M.]'s house. [Jeffrey Todd B.] said the car was stolen by three . . . men who beat him and sprayed him.

15.

"Detective Flores interviewed McGowan following his waiver of <u>Miranda</u>[8] rights. At first, McGowan said he had been at the motel all night. Then he admitted going to [William]'s house to talk to his father, not to rob him. McGowan said [William] had a rifle and, when he turned his back, McGowan grabbed him and took the gun. [William] ran down the hall and the gun would not shoot. Defendant McGowan left the house and said, 'Go get him before he gets another gun.'

"On July 24, 1992, district attorney's investigator [D.] Kennedy interviewed Sherry [Y.]. [Sherry Y.] said Yancey had done the stabbing and had taken the property from [William]'s house. She also said Yancey had a nonworking .25-caliber pistol in his pants pocket, he had the knife, and he was the only one with blood on his hands. Kennedy also interviewed Angela [M.] on the same day. At first, she affirmed that defendant McGowan had returned to the motel with a rifle and [petitioner] returned with a knife and a .25-caliber pistol. Upon further questioning, [Angela M.] said Yancey had the knife and the .25-caliber pistol and [petitioner] carried only a beer." (*People v. McGowan* (Mar. 14, 1995, F019199) [nonpub. opn.] (*McGowan*).)

## PROCEDURAL HISTORY

### I.    Underlying Convictions and Direct Appeal

We previously summarized the procedural history relating to petitioner's convictions as follows:

"On September 18, 1992, the Fresno County District Attorney filed an information charging petitioner with premeditated attempted murder (§§ 187, 664; count one), assault with a deadly weapon (to wit, a knife) and by means of force likely to produce great bodily injury (§ 245, former subd. (a)(1); count two), first degree robbery (§§ 211, 212.5; count three), and residential burglary (§§ 459, 460; count four). As to each count, the People alleged enhancements for personal infliction of great bodily injury (§ 12022.7)

---

[8] "<u>Miranda</u> v. <u>Arizona</u> (1966) 384 U.S. 436."

16.

and that a principal was armed with a firearm (§ 12022, subd. (a)(1)). Additionally, the People alleged petitioner had a prior serious felony conviction (§§ 667, subd. (a), 1192.7, subd. (c)), and had three prior felony convictions for which he had served a term of imprisonment (§ 667.5, former subd. (b)).[9]

"Petitioner, McGowan, and Yancey were tried together. On December 18, 1992, the jury found petitioner guilty as charged on all counts, and found true the allegations that he personally inflicted great bodily injury and a principal was armed with a firearm.[10] In bifurcated proceedings, the court found petitioner suffered a prior serious felony conviction and had served three prior prison terms." (*People v. Evans* (Feb. 3, 2022, F080113) [nonpub. opn.] (*Evans*).)

The court sentenced petitioner on count three to the upper term of six years, plus a one-year term for the arming enhancement, a three-year term for the great bodily injury enhancement, a five-year term for the serious felony enhancement, and three one-year terms for each of the prison term enhancements, for a total determinate term of 18 years. On count one, the court sentenced petitioner to a consecutive term of life with the possibility of parole. Upper-term sentences on counts two and four, and sentence on the

---

**9** "The information alleged the same offenses with respect to McGowan and Yancey, and further alleged that Yancey unlawfully possessed a firearm (§ 12021; count five), and that McGowan and Yancey personally inflicted great bodily injury (§ 12022.7), Yancey personally used a knife (§ 12022, subd. (b)), McGowan personally used a firearm (§ 12022.5, subd. (a)), and, as to Yancey, a principal was armed with a firearm (§ 12022, subd. (a)(1)). The information further alleged Yancey had a prior serious felony conviction (§§ 667, subd. (a), 1192.7, subd. (c))."

**10** "During jury deliberations, Yancey entered a plea of no contest to unpremeditated attempted murder, and he admitted a prior serious felony conviction as well as enhancements for personal infliction of great bodily injury, personal use of a knife, and a principal being armed with a firearm. The jury found McGowan guilty as charged on all counts and found he personally inflicted great bodily injury and personally used a firearm as to each offense."

enhancements to count one, were imposed and stayed.  (§ 654.)  (*McGowan*, *supra*, F019199.)

On appeal, this court reversed the great bodily injury enhancements as unsupported by the evidence and remanded for the trial court to prepare amended abstracts of judgment.  In all other respects, we affirmed.  (*McGowan*, *supra*, F019199.)

On remand, the trial court prepared an amended determinate abstract of judgment.  It appears the court did not simultaneously prepare an amended indeterminate abstract of judgment.  (See *Evans*, *supra*, F080113.)  The amended determinate abstract of judgment reflected that petitioner was sentenced on count three to an upper term of six years, plus one year for the arming enhancement, three years for the prior prison term enhancements, and five years for the prior serious felony enhancement, for a total determinate term of 15 years.  Upper-term sentences on counts two and four were once again imposed and stayed.  The great bodily injury enhancements, which this court had ordered stricken, were included on the abstract with an "S," which designation meant the enhancements were either stricken or stayed.

"Subsequently, in 2014, the trial court received a letter from the Department of Corrections and Rehabilitation, noting that it did not have an amended indeterminate abstract of judgment bearing petitioner's name." (*Evans*, *supra*, F080113.)  Thereafter, the trial court prepared an amended indeterminate abstract of judgment.  It appears the court did not simultaneously prepare an amended determinate abstract of judgment.  The indeterminate abstract of judgment reflected that petitioner was sentenced on count one to an indeterminate term of life with the possibility of parole.  The great bodily injury enhancement, which this court had ordered stricken, was noted to have been stayed.  In addition, the court erroneously added to the indeterminate abstract of judgment a four-year term for an arming enhancement pursuant to section 12022.5, subdivision (a), of which petitioner was neither charged nor convicted.

## II.     Petition for Resentencing

On August 16, 2019, petitioner, in propria persona, filed a petition for resentencing pursuant to former section 1170.95.  Petitioner checked every box on the form petition, stating that a complaint, information, or indictment was filed against him that allowed him to be prosecuted under a theory of felony murder or murder under the natural and probable consequences doctrine; he was convicted of first or second degree murder at trial; and he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019.  He further averred that he was not the actual killer, did not act with an intent to kill, and was not a major participant in the underlying felony or did not act with reckless indifference to human life in the course of the crime.  He also alleged he was convicted of second degree murder under the felony-murder rule or the natural and probable consequences doctrine, and a court or jury previously determined he was not a major participant and did not act with reckless indifference to human life.

On September 4, 2019, the trial court denied the petition with prejudice on the ground that resentencing "is not available to persons convicted of attempted murder."

On appeal, we reversed.  We noted that former section 1170.95 had been amended during the pendency of the appeal to permit resentencing of certain persons convicted of attempted murder under a natural and probable consequences theory.  We additionally noted that the superior court had erred in failing to appoint counsel or permit further briefing on the petition, as required under former section 1170.95.  We declined the People's request that we conclude petitioner was ineligible for resentencing as a matter of law and uphold the denial of the petition.  We noted that the jury instructions were "not a model of clarity regarding the acts and mens rea required to find an aider and abettor guilty of premeditated attempted murder" and "[i]n light of the ambiguity in the instructions, the procedural posture of the case, and the People's bare argument," we remanded for the superior court to conduct "such proceedings as necessary to determine

19.

whether petitioner is entitled to an order to show cause." We expressed no opinion on the ultimate merits of the petition. (*Evans*, *supra*, F080113.)

In addition to the foregoing, we noted that it appeared petitioner's prior prison term enhancements had recently been rendered invalid, and we directed the trial court to "address whether petitioner's prior prison term enhancements . . . must be stricken and [petitioner] resentenced pursuant to [former] section 1171.1."[11] We also ordered the court to correct the abstract of judgment to remove great bodily injury enhancements that previously were stricken, and to remove reference to the four-year sentence imposed pursuant to section 12022.5, subdivision (a), of which petitioner was not convicted, and to replace it with the one-year term originally imposed and stayed for a section 12022, subdivision (a)(1) enhancement, of which petitioner was convicted. (*Evans*, *supra*, F080113.)

## III. Proceedings on Remand

### A. Section 1172.6

On remand, petitioner, in propria persona, filed a second petition for resentencing pursuant to section 1172.6. On the form petition, he checked boxes alleging that a complaint was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, that he was convicted of attempted murder, and that he "could not presently be convicted of murder or attempted murder because of changes made to . . . [sections] 188 and 189, effective January 1, 2019."

Counsel was appointed to represent petitioner.

---

[11] Former section 1171.1 was renumbered section 1172.75, with no change in text. (Stats. 2022, ch. 58, § 12.) Except where otherwise noted, we refer to the current section 1172.75 in this opinion.

The People opposed the petition on the ground petitioner's jury was not instructed on the natural and probable consequences doctrine and the jury's premeditation finding established petitioner was found guilty as a direct aider and abettor. Petitioner responded that the petition was facially sufficient, and he argued the superior court should not consider any appellate opinion in determining whether he set forth a prima facie case. At the hearing on the petition, petitioner acknowledged the court could consider the jury instructions and verdicts. The People again argued the petition should be denied because petitioner's jury was not instructed on the natural and probable consequences doctrine and the jury instructions established he acted with premeditation and deliberation. The court took the matter under submission and the parties appeared again at a later date for the court's ruling. At the latter hearing, the court queried how section 1172.6 would apply to petitioner, given his jury was not instructed on a natural and probable consequences theory.[12] Defense counsel responded, "Right. That is why I have nothing further to add[.]"

The court denied the petition with prejudice on the ground petitioner had failed to make a prima facie showing of eligibility. The court noted petitioner's jury was not instructed on a natural and probable consequences or felony-murder theory and that he was convicted of willful, deliberate and premeditated attempted murder as an aider and abettor.

**B.      Section 1172.75**

The court then turned to the validity of petitioner's prior prison term enhancements. The prosecutor stated that he had discussed the matter with opposing counsel and they were "both in agreement as to what the ultimate sentence should be

---

[12] The court also erroneously stated that petitioner was "the sole defendant in the case." The court later corrected itself and acknowledged that "[t]his case did have multiple defendants, but [petitioner] himself was convicted of the attempted murder," and it "[did not] matter if others were or not."

21.

given prison priors we agree must be stricken." The court pointed out that petitioner was entitled to a full resentencing pursuant to section 1172.75 but "how that would change the mechanics of this case where there's an attempted murder with life with the possibility of parole, that really doesn't change in any way or form." However, the court noted it "might make a difference in the consecutive aggravated terms."

Defense counsel stated:

"I was speaking with [petitioner] yesterday already and was just confirming right now. We have discussed this issue. It is my belief that he would be eligible for complete resentencing. However, in this particular situation, because he was convicted of the attempted, premeditated murder and he received a sentence of life on that with the possibility of parole, the determinate term is what would be affected. And he is agreeable and amenable at this point in time foregoing the complete resentencing and just striking the prison priors – the 667.5(b) prison priors of which there were three in this particular case, just given the specific dynamics, the facts, the situation of this case."

The following colloquy ensued:

"THE COURT: All right. Given that, is that your request, [petitioner], that you just have those three separate prison priors stricken, the striking of the great bodily injury which was ordered by the Appellate Court, the removal of the gun enhancement and replacement with vicarious arming which was by Appellate Court direction? Besides those modifications you're just asking for the three prison priors to be removed. Is that your position, [petitioner]?

"[PETITIONER]: In a way it is, and in a way it ain't.

"THE COURT: All right. [Petitioner], we're not going to have a dialogue. My question is yes or no. If the answer is unknown because it's not a yes or no, then you need to discuss it further with [defense counsel] and schedule it for a hearing as needed. Do you need more time to discuss it with [defense counsel]?

"[PETITIONER]: No. It's good.

"THE COURT: You're sure about that? I don't want you to make rash decision and say that's good and go back to prison and decide to file an appeal because you're —

22.

"[PETITIONER]: No. It's good.

"THE COURT: So if you need more time, I'm more than happy to give you the time to be prepared to tell me through your attorney what exactly it is that you wish to be done.

"[DEFENSE COUNSEL]: Your Honor, I believe that he understands and is in agreement with what you just stated regarding the proposed changes.

"THE COURT: All right. And [defense counsel], you feel that you have spent enough time talking to your client about this issue and feel confident going forward with just removing the three prison priors consistent with the [a]ppellate decisions on prior occasion and remitt[itur]?

"[DEFENSE COUNSEL]: Yes, Your Honor. And the reason — just for the Court's information, the reason that I do believe that that is the case and I'm comfortable with that is because [petitioner] would be interested in resentencing if he believed that the attempted murder might somehow be, you know, stricken or taken off. And I think that's where his issues lie is in the underlying facts and the underlying conviction regarding the attempted murder. The resentencing on the other counts, the additional counts the enhancements, that portion is not where his issue lies."[13]

Defense counsel went on to state that "a total of 12 years of a determinate term is what should finally result once [the abstracts] are corrected." The court again questioned counsel and petitioner regarding this choice:

"THE COURT: All right. So at this point given that the defense is waiving a full resentencing — and I want to again be very clear. Is that your position, [defense counsel], on behalf of your client?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: And do you agree with that, [petitioner]?

"[PETITIONER]: Yeah.

---

[13] We note that, by the time of the resentencing hearing, petitioner would have served the entirety of his determinate term and would have been well into his parole eligibility period on the indeterminate term. Thus, a change in the determinate term alone would have no practical effect on petitioner's aggregate time in custody.

23.

"THE COURT: Is that a yes, sir?

"[PETITIONER]: Yeah."

The court proceeded to recall the sentence and resentence petitioner as follows: on count one to a term of life with the possibility of parole; on count two to a concurrent middle term of three years; on count three, to a consecutive aggravated term of six years, with an additional one-year term for the arming enhancement[14]; and on count four to a concurrent middle term of four years.[15] The court also imposed a five-year term for a prior serious felony enhancement pursuant to section 667, subdivision (a). The court noted the custody credits listed on petitioner's prior abstract of judgment and stated, "[H]e has many thousands of more days that the Department of Corrections will compute and add to make sure that all his credits are properly recorded." However, the court ordered that the original determination of custody credits be included on the abstract, leaving it to the Department of Corrections and Rehabilitation to add the additional credits.

This appeal followed.

## DISCUSSION

### I. Eligibility for Resentencing Pursuant to Section 1172.6

Petitioner contends he set forth a prima facie claim for resentencing that was not conclusively refuted by the record of conviction. He acknowledges his jury was not instructed on a natural and probable consequences theory of attempted murder but contends the jury instructions permitted the jury to convict him under an imputed malice

---

[14] The abstract of judgment erroneously lists this as an enhancement to count one. If the court reimposes this enhancement on remand, it should associate it with the correct count.

[15] Previously, petitioner was sentenced on counts two and four to upper-term sentences, which were stayed pursuant to section 654. It appears the court chose, when resentencing petitioner, to impose concurrent middle-term sentences on these counts at the prosecutor's suggestion.

24.

theory based solely on his participation in a crime. The People contend the lack of a natural and probable consequences instruction is fatal to petitioner's claim. Regardless, the People also contend the instructions required the jury to find petitioner acted with intent to kill and there is no reasonable likelihood the jury would have understood the instructions to permit a guilty verdict absent a finding of intent to kill.

## A. Applicable Law

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); accord, *People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).) Relevant here, the bill amended the natural and probable consequences doctrine by requiring that a principal act with malice aforethought before he or she may be convicted of murder or attempted murder.[16] (§ 188, subd. (a)(3); accord, *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).) "Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Senate Bill No. 1437 also added former section 1170.95, now renumbered as section 1172.6, which provides a procedure for persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under

---

[16] The bill also amended the felony-murder rule by providing that a participant in a qualifying felony is liable for murder only if the victim was a peace officer in the performance of his or her duties, or the defendant was the actual killer, aided and abetted the actual killer in the commission of first degree murder with the intent to kill, or was a major participant in the felony and acted with reckless indifference to human life. (§ 189, subds. (e), (f); accord, *Strong*, *supra*, 13 Cal.5th at p. 708.) The felony-murder rule is not at issue in this appeal.

25.

which malice is imputed to a person based solely on that person's participation in a crime, [or] attempted murder under the natural and probable consequences doctrine" to seek vacatur of the conviction and resentencing. (§ 1172.6, subd. (a); accord, *Gentile*, *supra*, 10 Cal.5th at p. 853.) "[T]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met ([§ 1172.6], subd. (b)(1)(A)), including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] [s]ection 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill [No.] 1437 (§ 1172.6, subd. (a)(3))." (*Strong*, *supra*, 13 Cal.5th at p. 708.) The sentencing court must then determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)–(c); accord, *Strong*, *supra*, 13 Cal.5th at p. 708.) In making this determination, the court may rely on the record of conviction. (*People v. Lewis* (2021) 11 Cal.5th 952, 970–971.) However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis*, at p. 971.)

"If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*People v. Curiel* (2023) 15 Cal.5th 433, 450 (*Curiel*).) If the trial court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder [or attempted murder] conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1172.6, subds. (c), (d)(1).) At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

## B. The Jury Instructions

Petitioner's jury was instructed that attempted murder requires "a union or joint operation of act or conduct and a certain specific intent *in the mind of the perpetrator*," and that the specific intent required was included in the definition of the crime. (Italics added.) The jury also was instructed that attempted murder requires proof that "[a] direct but ineffectual act was done *by one person* towards killing another human being; and [¶] . . . *[t]he person committing such act* harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being." (Italics added.) Additionally, "acts of a person who intends to kill another person will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to kill." With regard to premeditation, the jury was instructed, "If you find the defendant guilty of attempt to commit murder, you must determine whether this allegation [of willful, deliberate, and premeditated attempted murder] is true or not true." The instruction further stated, "To constitute willful, deliberate, and premeditated attempt to commit murder, *the would-be slayer* must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being." (Italics added.)

The aiding and abetting instructions provided in relevant part:

"The persons concerned in the [commission] of a crime who are regarded by law as principals in the crime thus [committed] and *equally guilty* thereof include:

"1. Those who directly and actively [commit] the act constituting the crime, or

"2. Those who aid and abet the [commission] of the crime." (Italics added.)

Additionally,

"A person aids and abets the [commission] of a crime when he or she,

27.

"(1) with knowledge of the *unlawful purpose* of the perpetrator and

"(2) with the intent or purpose of committing, encouraging, or facilitating the commission of *the crime*, by act or advice aids, promotes, encourages or instigates the commission of *the crime*."  (Italics added.)

## C.     Analysis

As we have explained, section 1172.6, subdivision (a) permits "[a] person convicted of . . . attempted murder under the natural and probable consequences doctrine . . . [to] file a petition . . . to have the petitioner's . . . attempted murder . . . conviction vacated and to be resentenced on any remaining counts" when certain conditions apply. One such condition is that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (a)(3).)  Our Supreme Court has recently explained that "a petitioner who alleges that he or she could not currently be convicted of a homicide offense 'because of changes to Section 188 or 189 made effective January 1, 2019' [citation] puts at issue all elements of the offense under a valid theory" (*Curiel*, *supra*, 15 Cal.5th at p. 462), and this allegation is not refuted "unless the record conclusively establishes every element of the offense" (*id*. at p. 463).  Thus, *Curiel* permits us to affirm the denial of petitioner's petition at the prima facie stage only if the record of conviction conclusively establishes that petitioner aided in the commission of attempted murder with knowledge of the direct perpetrator's intent to kill and with the intent to encourage or facilitate that purpose.  (§§ 187, subd. (a), 664; *People v. Guerra* (1985) 40 Cal.3d 377, 386 [attempted murder requires a specific intent to kill]; *People v. Beeman* (1984) 35 Cal.3d 547, 560–561 [elements of aiding and abetting a specific intent crime].)

We begin by acknowledging that petitioner's jury was not instructed on the natural and probable consequences doctrine.  In many cases, the lack of such instruction, combined with complete instructions on aiding and abetting and the elements of attempted murder, is likely sufficient to conclusively rebut a petitioner's claim that he or

she could not currently be convicted of a homicide offense under the amended law of murder.  Here, the jury was instructed that attempted murder requires the direct perpetrator to have made a direct but ineffectual act toward killing another human being with a specific intent to kill.  Although the aiding and abetting instruction was not specifically tailored to the offense of attempted murder, the instruction informed the jury that a person aids and abets the commission of "a crime" when he or she aids, promotes, encourages or instigates the commission of "the crime" with knowledge of the unlawful purpose of the perpetrator and the intent or purpose of committing, encouraging, or facilitating the commission of "the crime."  Thus, to convict petitioner of aiding and abetting attempted murder, the jury seemingly was required to find that petitioner knew of the perpetrator's unlawful purpose – which, for attempted murder, could only be the intent to kill – and intended to aid in the commission of murder when he aided, promoted, encouraged, or instigated the commission of the attempted murder.  Such finding would rebut petitioner's contention that he could not presently be convicted of attempted murder because of changes to section 188 or 189 made effective January 1, 2019.  (See § 1172.6, subd. (a)(3).)

Nonetheless, as petitioner points out, he was convicted at a time when the natural and probable consequences doctrine was still a somewhat nascent theory of accomplice liability, at least outside the context of criminal conspiracies.  (See *People v. Prettyman* (1996) 14 Cal.4th 248, 261, 263, fn. 5.)  The first mention of the doctrine in pattern jury instructions pertaining to accomplice liability was in a 1976 supplement (CALJIC No. 300 (3d ed. 1976 rev.), which suggested natural and probable consequences language as an optional addition to the pattern instruction defining principals.  (*Prettyman*, at p. 263.)  It was not until 1988 that the doctrine was included in a separate, more detailed instruction, CALJIC No. 3.02 (5th ed. 1988), in apparent response to criticism by an appellate court that the former instruction was inadequate.  (*Prettyman*, at pp. 263–264.)

29.

The pattern instruction thereafter continued to evolve, even after petitioner's conviction. (*Id.* at pp. 264, 266–270.)

However, even before the advent of such pattern instructions, courts regularly considered the doctrine in determining whether substantial evidence supported a defendant's conviction of a crime under an accomplice liability theory. "In [several] instances, the courts generally had no difficulty in upholding a murder conviction, reasoning that the jury could reasonably conclude that the killing of the victim . . . was a 'natural and probable consequence' of the assault that the defendant aided and abetted." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 262 [collecting cases decided both before and after instructions were developed].) In others, "courts upheld jury verdicts convicting the defendant of assault and/or attempted murder, on the ground that the jury could reasonably conclude that the crime was a natural and probable consequence of the robbery aided by the defendant." (*Id.* at p. 263 [same].)

Petitioner's trial occurred after the natural and probable consequences instruction had been developed, but no such instruction was given in his case. Nonetheless, as we previously explained: "[T]his court found the natural and probable consequences doctrine applicable in petitioner and McGowan's direct appeal. There, McGowan challenged the sufficiency of the evidence to support a finding he aided and abetted the crimes, as well as whether the jury instructions on aiding and abetting were proper and sufficient. We noted that an aider and abettor 'is liable for the natural and reasonable or probable consequences of any act he knowingly aided or encouraged,' and that 'derivative criminal liability of an aider and abettor for a perpetrators' crime may exist even though that crime was unintended by the aider and abettor.' We explained, 'The perpetrator's criminal act must be the probable and natural, the natural and reasonable, or the reasonably foreseeable consequence of a criminal act encouraged or facilitated by the aider and abettor.' (*McGowan*, *supra*, F019199.) We concluded McGowan was criminally liable as an aider and abettor, 'even though the actual perpetrators' crimes may

30.

have been unintended by [him].' (*Ibid.*) We reached this conclusion despite the lack of a specific instruction on the natural and probable consequences doctrine having been given to the jury." (*Evans*, *supra*, F080113.)

We find it difficult to discern how the jury may have convicted petitioner under a natural and probable consequences theory that was not presented to it. We are therefore sympathetic to the superior court's view that the lack of such instruction is fatal to petitioner's claim of resentencing eligibility pursuant to section 1172.6. But, we are also mindful that we do not have before us a complete record of petitioner's trial. That record, which would have been before this court in petitioner's direct appeal, led this court to conclude that the natural and probable consequences doctrine was a viable theory of liability in petitioner and McGowan's joint trial. (*McGowan*, *supra*, F019199.) In light of these factors, we cannot say that the record conclusively establishes that the jury found every element of the offense of attempted murder under a valid theory. The record therefore does not rebut petitioner's allegation that he could not currently be convicted of an attempted homicide offense because of changes to section 188 or 189 made effective January 1, 2019. (See *Curiel*, *supra*, 15 Cal.5th at pp. 462–463, 471.)

Accordingly, we will reverse the order denying the petition and remand with directions to issue an order to show cause.

## II.     Resentencing Pursuant to Section 1172.75

After denying the petition for resentencing pursuant to section 1172.6, the court resentenced petitioner pursuant to section 1172.75. Petitioner now contends the court erred in imposing a consecutive term on count three and concurrent terms on counts two and four, and the matter must be remanded for the court to stay all but one of the terms imposed. He also contends the court should conduct a full resentencing on remand, including application of amendments to sections 1170 and 1385. Lastly, he contends the court on remand must recalculate his custody credits and include that recalculation in the abstract of judgment.

The People concede the court erred in imposing concurrent terms on counts two and four. As we explain, we accept the People's concession. However, we conclude this error requires remand for the court to determine which term or terms to stay pursuant to section 654. We also accept the People's concession that the court erred in failing to recalculate petitioner's custody credits, and we will therefore direct the court to make this calculation on remand. In light of the remand for resentencing, we do not address petitioner's additional claims that the court erred in imposing a concurrent term on count three, and in failing to apply any applicable amendments to sections 1170 and 1385. Petitioner may raise these arguments in the trial court on remand.

## A. Section 1172.75 Procedure

Subsequent to petitioner's original sentencing, Senate Bill No. 136 (2019-2020 Reg. Sess.) amended section 667.5, subdivision (b) to allow for the imposition of one-year prior prison term enhancements only for specified sexually violent offenses.[17] (Stats. 2019, ch. 590, § 1.) Subsequently, Senate Bill No. 483 (2021-2022 Reg. Sess.) (Senate Bill No. 483) added former section 1171.1, now renumbered section 1172.75, which provides that "[a]ny sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of [s]ection 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense . . . is legally invalid." (§ 1172.75, subd. (a).) Senate Bill No. 483 also provides a process for recall of sentences rendered invalid by Senate Bill No. 483 and resentencing of affected defendants.[18] (§ 1172.75, subd. (c).)

---

[17] It is undisputed that defendant's prior prison terms did not arise from qualifying sexually violent offenses.

[18] The resentencing process begins with corrections officials notifying the court that a defendant is serving a term for a judgment that includes an enhancement eligible for resentencing. (§ 1172.75, subd. (b)(2); see § 1172.75, subd. (c).) Here, the Department of Corrections and Rehabilitation identified petitioner on or before February 24, 2022, as serving a term for an eligible enhancement, and provided that information to the court through a secure file transfer portal on February 25, 2022. Thus,

32.

In resentencing a defendant pursuant to section 1172.75:

"(2) The court shall apply the sentencing rules of the Judicial Council and apply any other changes in law that reduce sentences or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing.

"(3) The court may consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice.

"(4) Unless the court originally imposed the upper term, the court may not impose a sentence exceeding the middle term unless there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and those facts have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1172.75, subd. (d)(2)–(4).)

### B.    Concurrent Sentences on Counts Two and Four[19]

Section 654, subdivision (a) bars multiple punishments for a single act. Additionally, section 654 bars multiple punishment for separate acts committed in an indivisible course of conduct. (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all

the parties agree, as do we, that the court had jurisdiction to resentence petitioner pursuant to section 1172.75 at the October 5, 2022 resentencing hearing. (See *People v. Cota* (2023) 97 Cal.App.5th 318, 332–333.)

[19] The People contend petitioner waived his resentencing claims by waiving a full resentencing. However, the People also concede the need to correct the court's error in imposing concurrent terms on counts two and four and in failing to recalculate petitioner's custody credits. In light of the People's concessions, we do not address the People's waiver arguments.

of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.)

On count two, petitioner was convicted of assault with a deadly weapon, to wit, a knife. The People concede that the attempted murder conviction on count one was based on this same act. As such, multiple punishment on both counts is prohibited by section 654. (*People v. Meriweather* (1968) 263 Cal.App.2d 559, 563–564 [multiple punishment for assault with a deadly weapon and attempted murder "committed in the same course of criminal conduct" prohibited by § 654].)

On count four, petitioner was convicted of residential burglary. The information indicates the burglary was committed by entering William's home with intent to commit a larceny. The People concede that section 654 prohibits petitioner from being punished for both this burglary, and the robbery of William alleged in count three. (*People v. Smith* (1985) 163 Cal.App.3d 908, 912 [§ 654 generally "bars punishment for both burglary and robbery where the sole purpose of the burglary was to effectuate the robbery"]; accord, *People v. Le* (2006) 136 Cal.App.4th 925.)

We accept the People's concessions as to both counts. The court erred in imposing and executing a concurrent term on count two while also imposing and executing sentence on count one. Likewise, the court erred in imposing and executing a concurrent term on count four while also imposing and executing sentence on count three.

The parties dispute the manner by which we may correct this error. The People contend we may order the abstract of judgment amended to reflect that sentences on counts two and four are stayed. This would have been an appropriate remedy under section 654, former subdivision (a), which required the court to punish a defendant "under the provision that provides for the longest potential term of imprisonment."

34.

However, at the time of petitioner's resentencing hearing, section 654 provided, as it does now: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) In other words, section 654 now "provides the trial court new discretion to impose a lower sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) The court did not exercise this discretion, and we will not speculate as to how it might do so.

Accordingly, we will vacate the sentence on counts two and four and remand for the court to exercise its discretion as to which counts to stay pursuant to section 654.

### C.	Further Application of Section 654

In addition to the foregoing arguments with regard to counts two and four, petitioner argues that all four of his convictions arose from an indivisible course of conduct with a single intent and objective. Thus, petitioner argues, he may properly be sentenced on only one of the counts.

We decline to address this argument, which was not raised below. "The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) Here, our vacatur of the sentence on counts two and four and our remand for resentencing entitles petitioner to a full resentencing. (See *People v. Bautista-Castanon* (2023) 89 Cal.App.5th 922, 927; *People v. Jones* (2022) 79 Cal.App.5th 37, 44; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.) Petitioner may make his arguments on remand regarding which counts should be stayed.

### D.	Other Amended Statutes

Petitioner contends we should direct the trial court to "exercise informed judicial discretion under all the new sentencing statutes." In particular, petitioner cites to section

1170, as amended by Senate Bill No. 567 (2021-2022 Reg. Sess.), and section 1385, as amended by Senate Bill No. 1393 (2017-2018 Reg. Sess.) and Senate Bill No. 81 (2021-2022 Reg. Sess.). As petitioner concedes, these amendments were in effect at the time of the resentencing. Nonetheless, petitioner agreed to forego a full resentencing. We therefore decline to address this argument. Petitioner may make his arguments on remand regarding the applicability of any changes in law to further resentencing proceedings.

### E. Corrections to Custody Credits

Petitioner argues, and the People concede, that the court on remand must calculate and grant petitioner custody credit for all days served up to and including the date of resentencing. We accept the concession and will order the court to make the necessary calculations, which shall be reflected on the amended abstract of judgment following resentencing.

A defendant is entitled to actual custody credit for " 'all days of custody,' " from the date of arrest and through the day of sentencing. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; see § 2900.5, subd. (a).) "When . . . an appellate remand results in modification of a felony sentence during the term of imprisonment, the trial court must calculate the *actual time* the defendant has already served and credit that time against the 'subsequent sentence.' " (*People v. Buckhalter* (2001) 26 Cal.4th 20, 23, quoting § 2900.1.)

On remand, the trial court shall recalculate petitioner's custody credits and amend the abstract of judgment as necessary.

### DISPOSITION

The order denying the petition for resentencing pursuant to section 1172.6 is reversed. Additionally, the sentence on counts two and four is vacated. The matter is remanded for the court to issue an order to show cause pursuant to section 1172.6 and for further resentencing pursuant to section 1172.75. When resentencing petitioner, the court

36.

shall recalculate petitioner's custody credits.  Finally, to the extent the court reimposes a section 12022, subdivision (a)(1) enhancement on remand, the court shall take care to associate this enhancement with the appropriate count.

DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


FRANSON, J.